**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**APRIL, 1998 SESSION**

FILED

November 2, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | No. 03C01-9707-CR-00299 |
| | ) | |
| Appellee | ) | |
| | ) | Cumberland County |
| vs. | ) | |
| | ) | Honorable John Turnbull, Judge |
| **JAMES CHRISTOPHER TATROW,** | ) | |
| | ) | (Felony Murder, Especially Aggravated |
| Appellant | ) | Kidnapping) |
| | ) | |

FOR THE APPELLANT:

JOHN E. APPMAN
P.O. Box 99
Jamestown, TN 38556

LARRY WARNER
P.O. Box 601
Crossville, TN 38557

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL J. FAHEY, II
Assistant Attorney General
Criminal Justice Division
425 Fifth Ave. North
Second Floor, Cordell Hull Building
Nashville, TN 37243-0493

WILLIAM E. GIBSON
District Attorney General

DAVID A. PATTERSON
ANTHONY J. CRAIGHEAD
Assistant District Attorney Generals
145 South Jefferson Ave.
Crossville, TN 38555

OPINION FILED: _____

**CONVICTIONS AFFIRMED; CONSECUTIVE SENTENCES
VACATED AND REMANDED**

CURWOOD WITT
JUDGE

**OPINION**

A jury in Cumberland County Criminal Court convicted the defendant, James Christopher Tatrow, of two counts of felony murder and two counts of especially aggravated kidnapping in the deaths of Roger Zammit and John Harry. The defendant was also convicted of two counts of premeditated and deliberate murder of the same victims. The trial court set aside those verdicts, however, as the thirteenth juror. See Tenn. R. Crim. P. 33 (f). In the sentencing phase, the jury declined to impose the death penalty or life without parole and sentenced the defendant to serve life sentences with the possibility of parole. At the conclusion of a sentencing hearing, the trial court ordered the defendant to serve two consecutive life sentences concurrently with sentences of 22 years for the kidnapping convictions. The defendant now challenges the validity of the convictions and the propriety of consecutive sentencing pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.

On appeal, the defendant raises several issues:[1]

1. The evidence presented at trial was not sufficient to support the jury verdicts.[2] (Defendant's issue #2)

2. Defendant's statement to police was taken under circumstances that violated Articles 1 and 9 of the Tennessee Constitution and the 5th and 14th Amendments to the United States Constitution. (Defendant's issue #4)

3. Photographs of the dead victims were inadmissible because their probative value did not outweigh their inflammatory effect. (Defendant's issue #3)

4. The trial court erred by overruling

---

[1]    We have reorganized the issues so that related topics are addressed together.

[2]    The defendant also contends that the evidence preponderates against the jury's verdict. This court may not reweigh the evidence or assess the credibility of witnesses. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990); Therefore we consider only whether the evidence is legally sufficient to support the jury's verdict beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e).

appellant's motion for mistrial after the prosecutor made an inflammatory remark to the jury during closing argument. (Defendant's issue #5)

5. Holding a second sentencing hearing after the jury imposed a life sentence for felony murder violates state and federal constitutional provisions against double jeopardy. (Defendant's issue #8)

6. The trial court erred by refusing to admit jurors' affidavits into evidence at the sentencing hearing. (Defendant's issue #7)

7. The trial court erred in sentencing the appellant to consecutive life sentences based on the finding that the defendant had an extensive record of criminal behavior. (Defendant's issues # 6 and #9)

Upon review of the record and the law, we affirm the defendant's convictions. The trial court, however, made equivocal findings as to whether consecutive sentencing is required to protect the public from the defendant's future criminal acts. See State v. Wilkerson, 905 S.W.2d 933, 938-939 (Tenn. 1995). Therefore, we vacate the order to run the sentences consecutively and remand the case in order for the trial court to make further findings pursuant to Wilkerson and to determine whether the life sentences should be served concurrently or consecutively to one another.

I. **Facts**

A. Facts presented during the guilt phase

At trial, both defense and prosecution witnesses testified to the bizarre events that led up to the two brutal murders. The record indicates that Chris Tatrow had been an outstanding rodeo cowboy, a college student, and a hardworking man who provided for his family.[3] As result of a painful back injury, however, he began

---

[3] Tatrow excelled on his high school rodeo team and was selected Cowboy of the Year in Tennessee for two consecutive years. He received a rodeo scholarship to UT Martin. A leg injury ended his active participation in rodeo; however, he continued to be involved as a stocker and a judge.

3

taking methamphetamine. At first, he used drugs infrequently, but by late 1994, he was a heavy user of methamphetamine, cocaine, and other drugs. He and his wife separated. After he was fired from his job, he turned to providing drugs to others in order to support his habit. His trailer became "a party place" with people coming and going at all hours and various people "crashing" at the trailer at different times. Although his family continued to check on him, he became distant and refused to discuss his activities with them. About two weeks before the killings, while Tatrow was in Texas, someone broke into his trailer. When he returned, he found a number of items missing including nearly one hundred prize belt buckles that he had won in rodeo events, a Navajo blanket that belonged to a close friend who had been killed, an antique knife collection, his great-grandfather's coin purse, a tool box, and several guns. He reported the burglary to the sheriff's department and later heard that several people including Roger Zammit, John Harry and Billy Teal were responsible for the burglary. On the Tuesday before the murders, Tatrow and four others went to the house of Billy Teal. According to a defense witness, Teal and his father held the group at gun point for at least a half an hour. The Teals took their photographs and warned Tatrow to forget about his missing property. In another incident, several shots were fired into Tatrow's home while he was present. One of the shots killed his German Shepherd.

During the afternoon of Thursday, January 12, Kenny Mason took Tatrow to Johnny Harry's cabin in the Dry Creek area.[4] Dondie Billings, who had been staying at Harry's, arrived along with Christy Mullican and Billings' boy friend, Roger Zammit. When Zammit opened the trunk of Billings' car, Tatrow saw a tool box that he believed had been taken from his trailer in the burglary. He became very angry, and the two men "swapped licks." The fight ended when Tatrow pulled a butterfly knife. Then everyone went into the cabin where Tatrow and Harry "cooked" either cocaine or methamphetamine in the microwave while Mason held

---

[4] At the sentencing phase, Tatrow testified that he went to Harry's place because Harry offered to exchange information about his missing belongings for cocaine.

4

a butcher knife and watched Zammit. Tatrow then announced that they were all going to his house "to party." Harry and his girl friend remained behind while Mason took Zammit in his car and Tatrow drove Billings and Mullican in Billings' car. On the way, Tatrow picked up Mike Redmon, who is Billings' half-brother, and Bruce Rochefort. Amber Frederick, who was asleep in the trailer, awakened when Mason and Zammit arrived. Phillip Lawrence, J. J. Hendrixson, Jeff Sanders, and Tony Dan arrived later.[5]

Ken Mason and Dondie Billings described in great detail the events of the next two days.[6] Amber Frederick and Christy Mullican were among those the defendant called. Although some of the details varied, their testimony is surprisingly consistent. As they described the situation, the trailer was in a state of seige, and Mason or someone else constantly sat looking out the front door with a shotgun in hand. Methamphetamine, marijuana, cocaine and other drugs were available and were used copiously by everyone who was present. No one slept more than an hour or two at a time. Apparently they were convinced that Harry or Billy Teal was coming to attack them. Tatrow was obsessed with recovering his belongings. At one point, he aimed an empty revolver at Zammit's head and clicked the trigger several times. Zammit was forced to stand with his arms in the air while Rochefort hit him in the ribs and face. At other times, Tatrow slapped and kicked Zammit. Apparently Zammit admitted that he knew where Tatrow's .22 rifle was located because he, Tatrow, and two other defendants drove to McMinnville that night and returned with the rifle. Later Tatrow took Zammit and Redmon to Harry's place and retrieved some of his belongings.[7]

---

[5] Phillip Lane Lawrence, James Talbert Hendrixson, Jr., Michael Redmon, Jeffrey Sanders and Kenny Mason were indicted for two counts of premeditated murder, two counts of felony murder, and two counts of especially aggravated kidnapping. Jimmy Anthony Dan was indicted for kidnapping only, and Bruce Edward Rochefort was indicted for kidnapping and aggravated assault. These men were awaiting trial when Tatrow's case was tried.

[6] The defense called the other defendants to the stand but each one refused to testify on Fifth Amendment grounds.

[7] Apparently, Harry was not at home when the men arrived.

Upon their return, Tatrow and some of the others continued to abuse Zammit. He was kicked in the face, chunks were cut out of his hair, and he received small incisions to his scalp, his shoulder, and his arms. An ear lobe was torn when an earring was forcibly removed. On the other hand, Zammit was allowed to shower, his wounds were treated, and an Ace bandage was wrapped around his ribs. He ate, and he and Billings lay together in Tatrow's bed during the day on Friday.

Sometime during Friday afternoon or evening, Tatrow and three others left and brought Johnny Harry to the trailer where they tied him 'spreadeagle' in a chair in the laundry room. Tatrow repeatedly threw a knife at the portion of the chair seat that was exposed between Harry's legs. Later Tatrow told a woman who stopped by the trailer for a few minutes that he had tied Harry to a telephone pole and whipped him with a belt. She saw the welt on Harry's back. Later, Tatrow kicked Harry in the chest or chin, and Harry banged his nose on a vanity. Blood spilled onto the carpet. Witnesses noted that Harry had a bad gash on his leg which Tatrow bandaged. After taking a shower, Harry lay on a pallet in the bedroom.

On Saturday morning, Tatrow and Mike Redmon went to a telephone and called Dondie Billings' parents. Sometime during the afternoon, Mr. and Mrs. Billings arrived to take her home. Dondie Billings testified that Tatrow got down on his knees and swore that he would take Zammit and Harry home as soon as she and Christy Mullican left. Billings' father saw Roger Zammit standing on the porch and told him to stay away from his daughter.

Harry and Zammit were not taken home. Tatrow did take Zammit to find him some pain medication. After taking two Xanaxes and drinking some beer, Zammit passed out, and Tatrow left him slumped over on the seat of the truck that

6

was parked in the yard.  At about this time, Amber Frederick returned.[8]  She was very upset because some of the Dry Creek group were coming, and she refused to stay any longer.  Tatrow was furious at her and ordered the others not to let her come back.  Thirty minutes later, Tatrow's mother stopped by the trailer to check on her son.  She spoke to him on the porch for a few minutes.  At trial she testified that he looked crazy.  She knew he was strung out on drugs.  When she tried to talk to him about it, he became enraged, and she left without entering the trailer.

Mason testified that after his mother left, Tatrow "wigged out."  Tatrow went into the trailer, grabbed Harry who was lying on the pallet, and started gouging him in the face with a styrofoam bat.  Jeff Sanders kicked Harry in the face and hit him with his fists.  Because Harry was bleeding badly, Tatrow ordered them to put him in the bathtub.  Mason and Sanders went outside and dragged Zammit out of the truck by his hair.  At Tatrow's direction, Mason applied duct tape to Harry's and Zammit's hands and mouths.  He put tape across Zammit's eyes.  Zammit was forced to kneel in the tub facing the faucets, and Harry was crowded in behind him.  Several people including Redmon, Hendrixson, and Sanders were in the bathroom.  According to Mason, he stepped out for a moment, and when he returned, Zammit had a plastic bag over his head and a cord around his neck.  Tatrow's knee was in Zammit's back, and he was pulling hard on the cord.  Mason said that it looked like Tatrow was "riding a bull."  When Zammit continued to struggle fiercely, Tatrow asked for a heavy flashlight which Mason provided.  Tatrow backhanded Zammit three times on the back of the head, and Zammit wilted.  Tatrow then walked out of the bathroom, but when someone said that Zammit wasn't dead, Tatrow returned and told Harry, who was still sitting in the tub, to pull on the cord.  Harry pulled for a few seconds while Tatrow laughed.  Everyone went into the kitchen leaving Harry sitting in the tub with Zammit's lifeless body.  Mason opened a window because it

---

[8]     The record indicates that people came and went numerous times. Several trips were made to purchase food, liquor, and drugs.  On Thursday evening, Mason and several others went out to eat.  Christy Mullican went home to shower and to pick up clean clothes.

7

"smelled bad" and turned off the light.

For twenty minutes, the men sat at the kitchen table smoking cigarettes and a "joint." Tatrow then told Mason and two others to help him get Harry out of the house. He told them to walk him out of the front door and into a nearby field. Harry walked in front of them, but when they went through the gate into the field, he broke away and ran. After about 30 yards, he stumbled and fell. Tatrow caught up to him, dragged him to his feet, and told him to keep walking. After Harry had taken a couple of steps, Tatrow kicked him in the leg and as he fell, fired one shot with the .22 rifle into the side of John Harry's head.

Over the next several hours, the men cleaned the trailer thoroughly and attempted to dispose of the evidence. They removed the bloody portions of carpet. Both bodies were wrapped first in woven wire fencing and then in carpeting. Tatrow, Redmon, and Hendrixson left in the truck to dispose of the bodies. Mason hid the revolver across the road in the brush and some dynamite in a nearby culvert, and then he and the others took the bloody towels, rags and clothes to Goose Creek where they burned them.

During the early morning hours of January 15, 1995, Dondie Billings reported to the DeKalb County Sheriff's Department that Roger Zammit and John Harry were missing. As result of this call, Steve Johnson, the chief deputy, went to Chris Tatrow's mobile home at about 4:00 a.m. Tatrow answered the door. Three men were sitting at the kitchen table drinking beer and playing cards. The home looked neat and clean. Tatrow admitted that Zammit and Harry had been there. He said that he'd given them "a good whipping" for stealing some of his stuff and had dropped them off in the Dry Creek area where they were picked up by someone in a black Camaro. The deputy noticed nothing out of the ordinary in Tatrow's speech or demeanor, and neither Tatrow nor the other men appeared to be intoxicated. He observed nothing unusual or out of place at the trailer.

8

Days passed and neither Zammit nor Harry returned to their homes. Deputy Johnson spoke with Kenny Mason who had lived at the Tatrow trailer for several weeks, and Mason gave a statement incriminating himself, Tatrow and several other young men. The police recovered the .357 magnum revolver hidden across the road from Tatrow's trailer. On January 24, 1995, TBI agents James Moore and Mark Gwyn arrested Tatrow and took him to the DeKalb County Jail. From there, he was transferred almost immediately to Putnam County. When a team from the Tennessee Bureau of Investigation pulled the bodies of the two young men from Center Hill Lake on January 27, Tatrow was in a holding cell in the Putnam County Jail. That afternoon, Moore and Gwyn served Tatrow with a warrant to search his truck. A few moments after the agents left the cell, Tatrow pounded on the door and asked to speak with them again. At 3:53 p.m, he admitted that late in the evening of January 14, he strangled Roger Zammit to death and then shot John Harry in the head with a .22 caliber rifle.

At trial, the medical examiner, Dr. Charles Harlan, testified that it would have taken anywhere from thirty seconds to three and one-half minutes for Roger Zammit to die of ligature strangulation. Zammit had multiple contusions on his face, lacerations on the back of his scalp, and a grooved depression and abrasion around his neck. He also had two shallow incisions on his upper arm and one on the left posterior flank. The cuts occurred prior to death as did the laceration to his bottom right ear lobe and the small gash behind his right ear. He had no broken ribs. Dr. Harlan opined that an average sized adult is strong enough to strangle someone by placing a knee in the victim's back and pulling. The doctor reported that John Harry died of a gunshot wound to the head. Harry had two incisions on his face and another on his left upper elbow that was covered by a Band-aid. He also had some superficial bruises. The single shot to Harry's head would have rendered him almost instantaneously unconscious and death would have occurred shortly thereafter.

9

In support of his insanity defense, the defendant offered the testimony of Dr. Donna Segar, a physician who is board certified in toxicology, and Dr. William D. Kenner, a psychiatrist at the St. Louis Psychoanalytic Institute. Dr. Segar testified that regular, long term use of substantial amounts of methamphetamine and cocaine would completely change one's personality.[9] Thought processes become delusional and paranoid. A person under the influence of "crank" or "ice" often speaks very rapidly and literally spits out the words through clenched teeth. Such a person demonstrates increasingly hostile and aggressive behavior and his judgment would be substantially impaired. She testified that two grams of methamphetamine per day is a high dosage and that a person who used that amount would experience hallucinations. A common hallucination, according to Dr. Segar, is the belief that insects or bugs are crawling under the skin. Dr. Segar did not examine the defendant but testified from her knowledge and experience.

Dr. Kenner spent several hours on two different days examining the defendant. He extensively interviewed family members and one co-defendant. Of significance were the facts that two members of the defendant's family suffered from depression and committed suicide, that the defendant's marriage had been troubled, and that a work injury to the defendant's back had caused considerable pain. Despite his injury, the defendant had continued to work long hours on the job and at home on the family farm. Within a few months, a cousin committed suicide and his parents divorced. After his separation from his wife, his drug use grew to unmanageable proportions, and in October of 1994, he was fired from his job. Dr. Kenner testified that the defendant changed from a likeable, fun-loving person who grew angry but never held a grudge into one who was increasingly cocky and aggressive. He became jumpy and twitchy and was unable to sleep for more than a few minutes at a time without medication. He experienced tactile hallucinations and would sometimes dig at himself with a knife. Dr. Kenner described a person

_____

[9] Testimony at trial indicated that the defendant was using two grams of "crank" a day in addition to a quarter gram of cocaine as well as substantial amounts of other drugs to "mellow" the highs and to allow him to sleep.

seriously addicted to methamphetamine as being very paranoid and frightened but "spoiling for a fight." Methamphetamine produces an increase of territorial aggression and cocaine decreases inhibitions and impairs judgment. The doctor concluded that at the time of the murders the defendant was suffering from an amphetamine-induced paranoid psychosis that would have a significant impact on his ability to conform his behavior and to self-examine his thinking and actions.

In rebuttal, the state presented testimony from Dr. Wisam Owais, the medical director and a psychiatrist at Plateau Mental Health Center, and Dr. Bob Freeman, a psychologist and chief executive officer of the Volunteer Behavioral Health Care System. Dr. Owais and Dr. Freeman interviewed the defendant on two occasions. They reviewed his medical records but interviewed no one other than the defendant. Dr. Owais concluded that there was no evidence of mental illness and that the defendant was able to appreciate the wrongfulness of his acts. Dr. Freeman agreed, but on cross examination, he conceded that the defendant talked about having some hallucinations. He also stated that taking methamphetamine, Valium, and cocaine at the same time would have an effect on one's judgment.

Based on these facts, the jury rejected the defendant's insanity defense and found him guilty of two counts of deliberate and premeditated murder, two counts of felony murder, and two counts of especially aggravated kidnapping.

B. Facts in the Sentencing Phase

No issue relates specifically to the sentencing phase of this capital case. However, in order to present a complete picture of the facts before the trial court at the so-called "second sentencing hearing," we briefly summarize the testimony presented during the sentencing phase

The defendant was convicted of both premeditated and felony murder. To avoid double jeopardy problems, the trial court decided to allow the jurors to

consider only the convictions for felony murder.[10]  The state relied upon the single aggravating factor, that "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(I)(5) (Supp. 1993).  The defense presented numerous witnesses, including the defendant, family members, and friends, in mitigation.

The prosecution called Agent James Moore as their only witness.  He used the charts prepared by the medical examiner to describe the various injuries sustained by the victims.  The trial court admitted into evidence several additional photographs of the bodies that it had excluded from the guilt phase.  Moore testified that the defendant had freely and voluntarily confessed to committing the crimes and that he had showed no remorse.

The defendant presented a thorough and well-documented mitigation defense.  Witnesses described the defendant as a popular leader who excelled at rodeo and as a successful student in high school.  As an adult, he was a hardworking family man who cared for his two young sons, kept a steady job, and loved his work on his parents' farm.  His parents and sister testified that the defendant was particularly devastated when, as a result of their divorce, his parents sold the farm.  They also testified to the personality and behavior changes they observed in the defendant during the months prior to the murders.  James Tatrow, the defendant's father, candidly admitted that he had provided his son with methamphetamine when his back hurt.  Numerous pictures of the defendant's family and his rodeo activities were admitted into evidence.  When the defendant took the stand, he wept as he described the events that led up to the two murders. The jury saw part of a very recent videotape showing the defendant playing with his two young sons.  During the showing, the defendant broke down on the stand and

---

[10]      The trial judge later announced that he was setting aside the convictions for premeditated and deliberate murder as the weight of the evidence preponderated against the verdicts.

begged the judge to turn off the tape.

After deliberating for approximately six hours, the jury found that the state had proven beyond a reasonable doubt that the murders were heinous, atrocious, or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death. However, the jury also concluded that the statutory aggravating circumstance did not outweigh the mitigating circumstances beyond a reasonable doubt and sentenced the defendant to imprisonment for life with the possibility of parole.

C. Facts at the sentencing hearing

On October 25, 1996, the trial court held a sentencing hearing to determine the appropriate sentences for the two especially aggravated kidnapping convictions and to decide whether the sentences should run concurrently or consecutively. The probation officer who prepared the presentence report noted that the defendant had a misdemeanor conviction for malicious mischief in which he and a friend had dumped a load of manure in a school parking lot. His testimony also disclosed that the defendant had begun smoking marijuana seven years prior to the murders and his drug use had escalated to include methamphetamine, cocaine, mushroom and a variety of tranquillizers and pain pills. TBI Agent James Moore testified for a third time. He testified that when the defendant made his statement there were no tears and no laughter, and that although the defendant appeared to be anxious, he was not remorseful. Tatrow admitted he was the leader. Not only did he accept responsibility for the deaths, but in Agent Moore's opinion, at times he was boasting. The state concluded with testimony from the victims' families which described the impact the murders had on their respective lives. The defendant again expressed his remorse for the killings. He also testified that he had not been involved in any drug activity in jail and that he was interested in pursuing his education while serving his time in prison. Diane Tatrow, the defendant's mother, described her son's emotional state on the night the murders

13

occurred and the change that had occurred now that he was free of drugs.

At the conclusion of the testimony, defense counsel moved that various exhibits and letters in the court's file be entered into evidence. The prosecution objected to the admission of the affidavits of two jurors who stated that a twenty-five year sentence was the appropriate punishment. To counter these affidavits, the state offered the affidavits of two other jurors who supported consecutive sentencing. After hearing arguments, the trial court decided to exclude all juror affidavits "out of an abundance of caution." The trial judge then placed on the record his findings relevant to the aggravating factors and mitigating factors as applied to the kidnappings and the criteria for consecutive sentencing.[11] The trial court then sentenced the defendant to serve 22 years for each kidnapping conviction. The court ordered that the defendant serve his two life sentences consecutively and that the two kidnapping convictions run concurrently with each other and the life sentences.

## II. Sufficiency of the Evidence

The defendant admits that he was involved in the kidnappings and that he killed the victims. He contends, however, that because he was suffering from a drug-induced psychosis, he was unable to formulate the requisite mens rea at the time these crimes were committed. The state argues that voluntary intoxication may not be used to negate the element of recklessness and that the evidence in the record demonstrates beyond a reasonable doubt that the defendant knowingly kidnapped and then recklessly murdered the victims. After reviewing the entire record and the applicable law, we find that the evidence presented at trial is legally sufficient to sustain the defendant's convictions.

When an accused challenges the sufficiency of the evidence, an

---

[11] We discuss the trial court's sentencing findings in greater detail in section V below.

appellate court's standard of review is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990). Since a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, a convicted defendant has the burden of demonstrating on appeal that the evidence is insufficient. State v, Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining that sufficiency, this court does not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992).

We first consider whether the defendant's evidence of heavy drug use may be used to negate the requisite mental state for felony murder.

Under the version of the statue in effect at the time of these crimes, felony murder was defined as "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or air craft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1994). Thus recklessness as a mens rea was required to support a conviction for a death occurring in the course of one of the enumerated offenses.[12]

---

[12] By statute, a person acts recklessly who acts with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk

15

Tennessee Code Annotated section 39-11-503 provides that evidence of intoxication may negate a culpable mental state. Tenn. Code Ann. § 39-11-503(a) (1997). Subsection (b) of the statute, however, states: "If recklessness establishes an element of an offense and the person is unaware of a risk because of voluntary intoxication, the person's unawareness is immaterial in a prosecution for that offense." Tenn. Code Ann. § 39-11-503(b) (emphasis added). The statute defines intoxication as the "disturbance of mental or physical capacity resulting from the introduction of any substance into the body," Tenn. Code Ann. § 39-133-503(d)(1), and voluntary intoxication as intoxication "caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known." Tenn. Code Ann. § 39-13-503(d)(3).

The defendant offered the testimony of two expert and several lay witnesses to prove that the heavy use of methamphetamine, cocaine and other drugs had changed the defendant's personality, distorted his sense of reality and impaired his judgment. Although the state's experts testified that they were unable to find any indication of mental illness, one of the experts agreed that drug use impairs the ability to make judgments. However, the defendant has not argued and nothing in the record suggests that his drug use and resulting intoxication was anything other than voluntary. Therefore, although the evidence was relevant to negate premeditation and deliberation in the first degree murder charges as well as the "knowing" element of especially aggravated kidnapping, the evidence cannot be used to negate the element of recklessness required to prove felony murder. See State v. James Lloyd Julian, II, No. 01C01-9511-CV-00371, slip op. at 37 (Tenn.

that the circumstances exist or the result will occur. The risk must be of such nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint. Tenn. Code Ann. § 39-11-302(c) (1991).

16

Crim. App., Knoxville, July 24, 1997)(perm. app. filed Oct. 30, 1997); Tenn. Code Ann. § 39-11-503, Sentencing Comm'n Comments.[13]

We must now determine whether the evidence in the record is sufficient to proved beyond a reasonable doubt that the defendant knowingly kidnapped and then recklessly murdered Roger Zammit and John Harry during the perpetration of the kidnappings.

To prove especially aggravated kidnapping, the state must show that "the accused knowingly removed or confined another unlawfully so as to substantially interfere with the other's liberty," Tenn. Code Ann. § 39-13-302(a) (1997), and that the removal or confinement was accomplished with a deadly weapon. § 39-13-305(a)(1) (1997). A person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. Tenn. Code Ann. § 39-11-302(b) (1997).

With respect to Roger Zammit, the evidence shows that the defendant believed that Zammit had stolen his property or at least knew where the property could be found. Ken Mason testified that, at Harry's cabin, the defendant gave him a knife and told him to hold it and watch Zammit. Later the defendant had Mason drive Zammit to his trailer. Although Mason indicated that the defendant never specifically said that Zammit was a prisoner, there was ample testimony from Mason and other witnesses that the understanding was that Zammit would not be permitted to depart. The defendant tried to cut hunks out of Zammit's hair, slashed his arms, kicked him in the face, and threatened him with a .357 pistol. The evidence is equally compelling in the case of John Harry. The defendant made two

---

[13]    This court has also recognized that evidence of a defendant's mental illness that does not rise to the level of an insanity defense may establish a claim of "diminished capacity" to form a requisite criminal intent. See State v. Phipps, 883 S.W.2d 138, 148 (Tenn. Crim. App. 1994).

17

trips to find John Harry whom he also suspected of being involved in the burglary of his trailer. The defendant, as well as others, were armed. Harry was whipped with a belt before he reached the trailer. He was tied in a chair, and the defendant taunted him by throwing a knife between his legs. Harry suffered cuts to his arms and on one leg. Both men were beaten and kicked by others while the defendant was present.

The record also contains considerable evidence on which the jury could have found that the use of illegal drugs had so incapacitated the defendant that he was incapable of acting knowingly at the time of the kidnappings. The trial court instructed the jury on the use of evidence concerning intoxication, gave an appropriate instruction concerning the defendant's capacity to form a culpable mental state, and provided the jury with the appropriate definitions. The jury, as trier of fact, resolves all factual issues raised by the evidence as well as questions concerning the credibility of the witnesses and the weight and value of the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In this instance, the jury resolved the issue in favor of the state. The facts support a conclusion that the defendant knowingly used a deadly weapon to confine both men so as to interfere significantly with their liberty.

The defendant admits that he killed Roger Zammit by strangling him with a cord and that he shot John Harry in the head with a .22 rifle. Such actions are, at a minimum, reckless. We conclude that a rational juror could have found beyond a reasonable doubt that the defendant knowingly kidnapped Roger Zammit and John Harry in order to obtain information about his missing property or to gain revenge upon them for the burglary and then, during the course of the confinement, recklessly killed both men.

The evidence in the record is sufficient beyond a reasonable doubt to support the defendant's convictions for the especially aggravated kidnapping of John Harry and Roger Zammit and their reckless murders. See Jackson v. Virginia,

18

443 U.S. 307, 317, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e).

### III. Suppression of Defendant's Statement

The defendant argues that the trial court erred in failing to suppress his confession because the confession was taken in violation of both Article I, Section 9 of the Tennessee Constitution and the Fifth Amendment of the United States Constitution. In this appeal, the defendant specifically contends that his confession should have been suppressed because (1) he was suffering from withdrawal symptoms that critically impaired his reasoning and judgment and prevented a knowing, intelligent and voluntary waiver of his constitutional rights; and (2) the officers obtained the confession through promises and coercion.

The record of the suppression hearing reveals that agents of the Tennessee Bureau of Investigation arrested the defendant for aggravated kidnapping on the morning of January 24, 1995. Agent Moore testified that they found him sleeping at the home of a friend and took him to the DeKalb County jail. When they advised him of his rights, he did not request an attorney; he declined, however, to make any statements. Shortly thereafter, he was transferred to the jail in Putnam County. On January 27, the agents visited the defendant to serve him with a search warrant and to take his photograph for booking purposes. By this time, the agents had taken statements from Ken Mason and several of the other young men who were involved, and the victims' bodies had been recovered from Center Hill Lake. Agent Moore testified that neither he nor Agent Gwyn asked him any questions about the crimes. They served the warrant, obtained his signature, and after taking his photograph out in the booking area, they went to speak to some detectives housed in another part of the same building.

The defendant's version of the circumstances under which the written statement was produced varies considerably from that of the agents. According to

19

the defendant, he was very ill when the agents arrived. He had last smoked "crank" at about 5:30 a.m. on January 24 and was now experiencing serious withdrawal symptoms. He was vomiting and suffering from diarrhea and severe cramps. He experienced several seizures and fell off the bed. His vision was blurred, he was sweaty, and he had difficulty walking. He believed he was going to die. He wanted desperately to return to DeKalb County because he knew how to get drugs in that jail. He asked the agents if they could get him sent back to DeKalb. They told him that if he helped them, maybe they could help him.

The defendant was in the holding cell in the jail's booking area. At the hearing, the booking officer testified that the defendant had been placed on "medical watch." From her chair, she was able to observe him through an eight by twelve window in the door of the cell. She remembered that he was extremely agitated and nervous. He spent a lot of time pacing back and forth in the cell, but she was unaware of any other physical symptoms. Occasionally, she would ask him how he was doing and he always responded "okay." He never asked for a lawyer. Within a few minutes after the agents departed, the defendant stopped pacing and began beating on the window and yelling. She recalled that he grabbed his head and shouted, "I can't take it any more. I want to confess. Get them back down here." Within a few minutes, the defendant was taken to the intoximeter room where the two agents were waiting.

According to Agent Moore, before they even said a word to the defendant, he spontaneously and immediately confessed, saying, " I did it. I killed them both. I'm the one that done it." The agents stopped him and read the standard Miranda warnings. After the defendant signed the written waiver, Moore proceeded to take down the defendant's version of the kidnappings and murders. Moore said that he asked the defendant very few questions because the defendant's story was coherent, cogent and logical. The defendant read the written statement, initialed a couple of corrections, and signed it. When he asked about

20

returning to DeKalb County, the agents explained to him that they could not arrange such a transfer. During the interview, which lasted less than an hour, the defendant showed little emotion and no remorse. In fact, Agent Moore testified, he seemed to be boasting.

The defendant testified that he could not remember how he happened to be interviewed. He did not know whether he asked to see the agents again or whether he was just taken to the interview room. The defendant had no recollection of making any statement upon entering the interview room. He did not recall signing any waiver form or hearing the Miranda warnings. He said that he was in a complete panic and would have confessed to anything in order to get back to his home county. Moore told him that he already knew the whole story because the defendant's friends had already talked. He just needed the defendant's corroboration. If the defendant would confess, they would get him back to DeKalb County. Everything, he was assured, would go much better for him if he confessed. The agents mentioned the death penalty and the electric chair several times. Agent Gwyn placed a telephone call ostensibly to arrange for the defendant's transfer. Moore determined the order in which the statement was taken. Most of the specific details, including the exact quotes, came directly from Moore. Moore would ask the defendant whether someone said something and then he would write it down. The defendant said that he never reread the statement because he was crying and could not see. Moore, he contended, guided his hand to where the initials were required and to the place where he wrote his signature.

At the request of the defendant's mother, attorney Martelia Crawford visited the defendant about thirty minutes after he gave his statement.[14] Ms. Crawford testified that, when she arrived, the defendant appeared confused. He was sitting on the cot with his knees clasped to his chest. He complained of hot

---

[14] Ms. Crawford was later appointed to represent the defendant. She withdrew from the case when she realized that she would have to be a witness at a suppression hearing.

flashes and chills and told her that he was vomiting greenish-black liquid and was unable to eat. He seemed very uncomfortable and distraught. His conversation was disjointed. She had to repeat her questions several times, and it was hard to get a complete answer from him. He showed her the copy of the search warrant, and, when she warned him not to talk to the police, he told her that he had just given a statement and that he would be transferred back to DeKalb County. She told him that he probably would not be moved unless a court ordered the transfer.[15]

At the conclusion of the hearing, the trial judge made thorough and specific findings. The court found that (1) the defendant was advised of his rights prior to making the statement and that he signed a proper waiver; (2) he never requested the services of an attorney; (3) there was no evidence of deceit or deception on the part of the officers; (4) nothing indicated that the officers used threats, violence, or coercion that overbore his will; (5) the defendant had a history of two years of serious drug abuse and was going through withdrawal at the time he gave his statement; (6) nothing indicated that the defendant was not functioning in a normal way during those two years despite his drug use; (6) the booking photographs taken at the time do not show that he was so distraught he didn't know what he was doing;[16] (7) when the defendant spoke to Ms. Crawford he was able to tell her about the search warrant and describe the agents; (8) the defendant was in a state of nervousness; (9) the defendant gave a detailed account that included statements made by various people and a coherent description of the events. Based on these findings, the trial court concluded that the defendant had knowingly and intelligently waived his constitutional rights and had voluntarily and freely given his incriminating statement.

---

[15] Dr. Donna Segar, the toxicology expert, testified at the suppression hearing as well as at trial. Since her testimony concerning the effects of prolonged use of methamphetamine and cocaine is virtually the same in both settings, we have not included it here.

[16] According to the transcript of the suppression hearing, the booking photographs were admitted as exhibits. They were not included, however, in the record on appeal.

It is well settled that when a trial court makes finding of facts at the conclusion of a suppression hearing, those facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The facts are binding on this court unless the evidence in the record preponderates against them.

> Questions of credibility of witnesses, the weight and value of the evidence and resolution of conflicts of evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997); Stephenson, 878 S.W.2d at 544.

In this case, the evidence concerning the defendant's physical and mental condition was heavily controverted with each side presenting testimony that supported its contentions. The trial court, however, resolved the conflicting testimony in the state's favor. After examining the record, we cannot conclude that the evidence preponderates against those findings, and this court, therefore, is bound by them.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Our supreme court has previously held that "[t]he significant difference between these two provisions is that the test of voluntariness for confessions under Article 1, Section 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265 (Tenn. 1992).

To admit a defendant's written statement into evidence, the statement

23

must have been given voluntarily by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. See State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). The prosecution may not use statements, whether inculpatory or exculpatory, that stem from custodial interrogation unless it demonstrates the use of procedural safeguards that effectively secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); Crump, 834 S.W.2d at 268. Here, the trial judge found that the agents properly advised the defendant of his rights and that he signed a written waiver of those rights. Although the trial judge found that the defendant was experiencing withdrawal from his prolonged use of methamphetamine and cocaine, the court also found that the defendant was not in such a state that he did not understand what he was doing. The record shows that, after the defendant made his spontaneous incriminatory remarks, the agents prevented him from making any further statements until they had advised him of his constitutional rights and obtained a written waiver. Absent any evidence of overreaching by the police, the waiver is valid. Bush, 942 S.W.2d at 500-501.

A confession must be free and voluntary, and it must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence or other evidence of police overreaching. Bram v. United States, 168 U.S. 532, 18 S. Ct. 183 (1897). The issue of voluntariness requires the trial judge to focus on whether the behavior of the state's agents was such as "to overbear" the accused's will to resist and thus bring about a confession that was not freely given. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). In this case, the defendant contends that the agents used deception and coercion to obtain his statement. Specifically, he alleges that they promised to have him transferred back to his home county and tricked him with a phony telephone call. He also alleges that they threatened him with the death penalty and that Agent Moore virtually dictated the statement to him using information obtained from the statements of other co-defendants. The trial

24

judge, however, believed the testimony of the state's witnesses rather than the defendant with respect to these factual issues. He found that no deception occurred and that the agents made no promises or threats. This court does not determine the credibility of the witnesses or weigh their testimony and must, therefore, accept that judgment unless the evidence preponderates against the holding. Odom, 928 S.W.2d at 23.

If the defendant is capable of making a coherent statement concerning his participation in a crime, the statement is admissible even if he were under the influence of drugs at the time. State v. Green, 613 S.W.2d 229, 232-33 (Tenn. Crim. App. 1980). When pressed, even the defendant's expert witness conceded that the statement was coherent, chronological, and rational. A trial court's determination at a suppression hearing is presumptively correct. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). Based on the record before us and cognizant of the appropriate standard of review, we conclude that the defendant knowingly, intelligently and voluntarily gave his statement to the police. The trial court did not err in admitting the defendant's statement into evidence.

## IV. Admissibility of Photographs

During the guilt phase of the trial, the trial court allowed the state to introduce into evidence two photographs of the victims' bodies taken after they were retrieved from Center Hill Lake. The state requested that five pictures be admitted. After a jury-out hearing, the trial judge ruled that the prejudicial effect of three of the pictures substantially outweighed their probative value. Two remaining photographs, however, the trial judge ruled were relevant and admissible.[17] Neither photograph shows the face of the victim. The carpet is gone, but both bodies are wrapped in the woven wire fencing. In Exhibit 9, John Harry's body lies face down on the gravel beach. A wound to the back of his head is barely visible. Exhibit 12

_____

[17] The trial court permitted the introduction of the other three photographs in the sentencing phase. The defendant does not contest the admission of those photographs.

25

shows the body of Roger Zammit and includes the cinder block used to weight the body. The cord around his neck is visible although most of his face is hidden. Duct tape is visible in Harry's hair and around Zammit's hands.

In this appeal, the defendant argues that the photographs, which were taken after the bodies had been in the lake for approximately twelve days, were gruesome and inflammatory and offered no additional information or assistance to the jury. The state contends that the photographs were probative of the physical torture endured by the victims, of the process and detail of the disposal of the bodies, and as corroboration of the defendant's confession.

To be admissible, a photograph must be relevant to some issue at trial, and the prejudicial effect of the photograph must not outweigh its probative value. Bush, 942 S.W.2d at 514; State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). The admissibility of photographs is within the sound discretion of the trial court and the court's determination will not be overturned on appeal except upon a clear showing of an abuse of discretion. Bush, 942 S.W.2d at 514; State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App. 1995).

Although it is a close question in this instance, we conclude that the trial court did not abuse its discretion in admitting the photographs. The probative value of the photographs is somewhat diminished due to the bodies' long exposure to lake water; however, they were relevant to supplement the testimony of the medical examiner and to corroborate the details provided by Kenny Mason and the defendant's statement. See Stephenson, 878 S.W.2d at 542. The photographs are not pleasant to observe, but they are not unduly gruesome nor are they misleading. Their probative value is not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; see State v. Banks, 564 S.W.2d at 951. Moreover, even if it were error to admit the photographs, the error would be harmless given the overwhelming proof of the defendant's guilt.

26

## V.   Prosecutor's Inflammatory Remark

The defendant next complains that because of the prosecutor's remarks he is entitled to a reversal of his convictions. During closing, the prosecutor said, "Now I submit to you, with head bowed, defendant sits before you, a tear now and then. What purpose does this serve? Pure theatrics, a show for you . . . . I can assure you that others have cried an ocean of tears. I can assure you that he shed no tear on the night when he brutally murdered two young men." The defendant contends that these remarks were intended to make the jury doubt the remorse and sincerity of the defendant and to inflame the jury. The state argues, first, that the issue is waived because the defendant failed to make a contemporaneous objection, and, second, that the argument related to the veracity of a witness and was within proper bounds.

We find that the defendant waived this issue although for other reasons. Prior to trial, defense counsel filed a detailed motion in limine for the purpose of limiting the prosecution's arguments. The motion was granted by the trial court with the limitation that if the state believed that an argument within the purview of the motion were appropriate, the prosecutor must seek the leave of court before making that argument to the jury. At the first opportunity after the jury left the court room, defense counsel brought the remarks to the attention of the trial judge.[18] The trial judge agreed that the remarks were inappropriate and were covered by the motion in limine. He offered to submit a supplemental instruction to the jury. He also requested that the defense submit a written motion requesting a mistrial although he did not intend to grant the motion. The trial judge said he had observed the jury closely during closing arguments. He believed that the improper remarks were poorly received and would likely prove more prejudicial to the state than to the defendant.[19] Defense counsel filed the requested motion for a mistrial but declined

---

[18]    The defendant objected to two other remarks made during closing but has not addressed them on appeal.

[19]    The trial judge said that he had almost interrupted the prosecutor to give a cautionary instruction but decided that it would only further call attention to the improper argument.

the trial court's offer to issue a supplemental instruction as the instruction would only call attention to the improper statement.

Rule 36(a) of the Tennessee Rules of Appellate Procedure provides that relief need not be granted to a party who fails to take whatever action was reasonably available to prevent or nullify the harmful effect of an error. In this case, defense counsel, after taking some time for deliberation, declined the trial court's offer to give a supplemental instruction to the jury. The defendant cannot request relief from an appellate court when he refused for strategic reasons appropriate relief offered by the trial court.

## VI. The "Second" Sentencing Hearing

At the conclusion of the sentencing phase of this capital case, the jury sentenced Tatrow to life imprisonment for each felony murder conviction. On October 25, 1996, the trial court held a sentencing hearing to set punishment for the especially aggravated kidnapping convictions and to consider consecutive sentencing. Tatrow contends that this "second" sentencing hearing violates state and federal constitutional provisions against double jeopardy because the trial judge charged the jury in the first sentencing proceeding to consider the mitigating circumstances and the aggravating circumstances which were raised by the evidence during the entire course of the trial. At the later hearing, the state presented no new evidence. Since all of the state's evidence before the court in the second hearing, the defendant contends, was previously considered by the jury, the defendant contends that he was twice placed in jeopardy upon the same facts.

The argument is an interesting one; however, the protections against double jeopardy are simply inapplicable in this instance. The language in the state and federal constitutions are similar. Both provide that no person shall, for the same offense, be twice put in jeopardy of life or limb. U.S. Const. amend. V; Tenn. Const. art. I, § 10. Our supreme court has held that double jeopardy protects a

28

defendant from (1) re-prosecution for the same crime after an acquittal; (2) re-prosecution for the same crime after a conviction, and (3) multiple punishments for the same offense. State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996); see also North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969).

We are unable to see how the hearing held on October 25, 1996 violated double jeopardy principles. Double jeopardy principles do not preclude separate sentencing hearings for convictions for different offenses. In this instance, the trial court was required to impose sentences for especially aggravated kidnapping and to determine whether the life sentences imposed by the jury would be served consecutively or concurrently. See Tenn. Code Ann. § 40-35-115 (1997). The fact that the determination was made on a different day after additional argument and upon hearing of testimony from the victims' families does not create a violation of double jeopardy principles.

Moreover, it has long been recognized that the use of the same evidence to determine the range and length of a sentence and to determine whether that sentence is to be served concurrently or consecutively does not violate double jeopardy. State v. Davis, 757 S.W.2d 11, 13 (Tenn. Crim. App. 1987). There is no prohibition, either statutory or constitutional, against using the same facts and circumstances to enhance sentences under the applicable enhancement factors and to require those sentences to be served consecutively. State v. Meeks, 867 S.W.2d 361, 377 (Tenn. Crim. App. 1993). We are unable to conclude that double jeopardy principles prevent the state from using evidence presented in the sentencing phase of a capital case in a later hearing to determine whether consecutive sentencing was appropriate.

### VII. Jurors' Affidavits

Included in the defendant's response to the state's Motion for Consecutive Sentencing were the affidavits of two jurors indicating that these jurors

29

believed that the defendant was capable of rehabilitation and that he should serve the two life sentences concurrently. At the sentencing hearing, the prosecution, while arguing that the affidavits were inadmissible, tendered affidavits from two other jurors who believed that consecutive sentencing would be appropriate. After hearing the arguments of both parties, the trial court decided "in an abundance of caution" not to admit into evidence any of the affidavits.

In this appeal, the defendant contends that the affidavits should have been admitted as jurors are the exclusive judges of the facts.[20] The state argues that the affidavits were inadmissible pursuant to Rule 606(b) of the Tennessee Rules of Evidence. Although we find Rule 606 to have little bearing on this matter, we conclude that the trial court did not abuse its discretion in refusing to admit the affidavits into evidence.

Neither portion of Rule 606 provides much guidance in this instance. Subsection (a) of the rule prohibits a juror from testifying as a witness "before that jury in the trial of the case in which the juror is sitting." Tenn. R. Evid. 606 (a). Because there is no jury involvement in the sentencing hearing, subsection (a) does not necessarily preclude the admission of the affidavits. Subsection (b) provides that, when an inquiry is made into the validity of a verdict or an indictment, a juror may not testify as "to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotion as influencing that jury to assent to or dissent from the verdict or indictment or concerning the juror's mental processes. . . ." Tenn. R. Evid. 606(b). The rule is addressed to a situation in which a juror's affidavit is submitted in connection with a motion challenging the verdict and seeking a new trial. Tenn. R. Evid. 606, Sentencing Comm'n Comments. The affidavits, in this instance, were offered at

---

[20] The defendant's brief contains no citation to authority to support this argument. Although we have chosen to address this issue on its merits, we remind counsel that issues unsupported by argument, citation to authority, or appropriate references to the record may be treated as waived by this court. Tenn. R. Ct. Crim. App. 10(b).

a sentencing hearing on the issue of consecutive sentencing, and they contain nothing that would be of relevance to a challenge to the validity of a jury verdict. We conclude that Rule 606 neither permits nor forbids the admission of juror affidavits in this situation.

Trial courts have, however, broad discretion in determining the admission of evidence. See State v. Hutchinson, 898 S.W.2d 161, 172 (Tenn. 1995); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). This court will not disturb a trial judge's discretion to admit or exclude evidence unless it is exercised arbitrarily. Baker , 785 S.W.2d at 134.

As noted above, we find nothing in Rule 606 that forbids the admission of the proffered affidavits. Moreover, at a sentencing hearing, traditional rules of evidence are relaxed. Traditionally, any evidence that the judge deems trustworthy and probative is admissible in a sentencing hearing regardless of its admissibility under the rules of evidence. State v. Hawk, 688 S.W.2d 467, 472 (Tenn. Crim. App. 1985). Sentencing Commission Comments to Tennessee Code Annotated section 40-35-210 state:

> The provision of subsection (b) require the court to consider all of the proof at trial ... [and] evidence and information offered by the parties on the mitigation and enhancement factors . . . . This subsection permits the court the greatest latitude in considering all available information in imposing the appropriate sentence and sentence alternative.

Tenn. Code Ann. § 40-35-210 (1997), Sentencing Comm'n Comments.

The trial judge in this instance, did not give a specific evidentiary reason for excluding the four affidavits nor did he mention relevance or probative value. However, we do not conclude that the trial court abused its discretion.

Evidence must be probative and trustworthy to be admitted in a sentencing hearing. State v. Mackey, 553 S.W.2d 337, 334 (Tenn. 1977); Jerry

31

Lynn Hopson v. State, No. 03C01-9308-CR-00249, slip. op at 4-5 (Tenn. Crim. App., Knoxville, Sept. 27, 1994), perm. app. denied (Tenn. 1995). The decision to impose concurrent or consecutive sentences lies exclusively with the trial court. Evidence presented in a sentencing hearing should provide the trial court with the facts necessary to make a determination according to the legal requirements found in the statutes. Even victim impact statements, which are permitted by Tennessee Code Annotated section 40-38-202, are defined as "a statement providing information about the financial, emotional, and physical effects of the crime on the victim and the victim's family . . . ." Tenn. Code Ann. § 40-38-203(2) (1997) (emphasis added). The opinion of a juror on the subject of consecutive sentencing is no more relevant than the opinion of anyone else. In this instance, the affidavits expressed the opinions of individual jurors as to the propriety of consecutive sentencing. Not surprisingly, the two obtained by the state were completely opposite to those offered by the defense. The four mutually contradictory affidavits would have been of no assistance to the finder of fact. They could not have made the existence of any fact that was of consequence to the trial court's determination more probable or less probable. Tenn. R. Evid. 401. Simply put, the affidavits were irrelevant. The trial judge did not abuse his discretion by excluding them at the sentencing hearing.

## VIII. Consecutive Sentencing

In his final issue, the defendant contends that the trial court erred in ordering him to serve his two life sentences consecutively. The defendant, who was 28 when he was sentenced, will not be eligible for parole until he is over 75 years old.[21] In essence, the defendant argues that consecutive sentencing undermines the jury's decision to sentence him to life sentences with the possibility of parole. He also argues that, because the trial court found that he had previously been a dependable, honest, well-behaved citizen who maintained full employment and who

---

[21] The trial court ordered that the two 22-year sentences for especially aggravated kidnapping run concurrently to each other and to the life sentences.

had, except for a single misdemeanor conviction, a clean criminal record, it was error to impose consecutive sentences. The state, however, points to the defendant's history of extensive use of illegal drugs, the need for deterrence, and the torture and brutality of the crimes as ample justification for consecutive sentencing. We conclude that because the trial court affirmatively found that consecutive sentencing was not required to protect society, State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), as interpreted by the bulk of opinions from this court, precludes the use of consecutive sentences.

At the conclusion of the sentencing hearing, the trial court found that six enhancement factors applied to the especially aggravated kidnapping convictions: (1) the defendant has a previous history of criminal behavior; (2) the defendant was a leader in the commission of the offense: (5) the defendant treated or allowed the victim to be treated with exceptional cruelty; (6) the injuries inflicted were particularly great; (10) the defendant had no hesitation about committing the crime when the risk to human life was high; and (16) the crimes were convicted under circumstances in which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114 (1), (2), (5), (6), (10), (16). As mitigating factors, the trial court found that the defendant had acted under some provocation and that there were some grounds that tended to excuse or justify his acts. See Tenn. Code Ann. § 40-35-113 (2), (3) (1997). However, the trial court found that the provocation was comparatively weak and the grounds were insubstantial and so accorded these factors little weight. As the defendant has not challenged the applicability of any of these factors, and he does not complain about the kidnapping sentences imposed by the trial court, we need not review either the factors or those sentences in any detail.

In conjunction with the enhancement and mitigating factors, the trial court also made the following factual findings:

1. The defendant had been a good family man prior to being overtaken by drugs.

33

2. The defendant was a good steady worker who had maintained regular employment until four months prior to the commission of the offenses.

3. The defendant had been a better than average citizen.

4. The defendant showed genuine remorse for his crimes.

5. The defendant has the ability to rehabilitate himself.

The trial court also concluded that the defendant's behavior leading up to and during the commission of the crimes indicated little or no regard for human life, that the defendant had no hesitation about committing a crime when the risk to human life is high, that the circumstances were aggravated, and that the length of the aggregate sentences were reasonably related to the severity of the offenses. Offsetting these findings, however, the court found that the defendant was capable of rehabilitation and that, if he remained drug free, society would not need further protection from criminal behavior on the part of the defendant.

With respect to the consecutive sentencing criteria, the trial court found that the defendant, despite his four-month immersion in buying and selling drugs, was not a professional criminal. See Tenn. Code Ann. § 40-35-115(b)(1). The trial court also concluded that the defendant was not a dangerous offender. However, relying upon the defendant's extensive and admitted record of drug use, the trial judge believed that the facts of the case required consecutive life sentences. He concluded:

> As I found above, the Defendant's record of criminal activity is extensive. In addition, he committed two aggravated first degree murders which were heinous, atrocious and cruel. Were I to sentence concurrently, it would be the equivalent of sending a message to the Defendant and to DeKalb County that you get one murder free.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a

34

presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d)(1990). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, counsels' arguments, the appellant's statements, the nature and character of the offense, and the appellant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1990); State v. Ashby, 823 S.W.2d at 169. The defendant has the burden of demonstrating that the sentence is improper. Id. In the event the record fails to demonstrate the appropriate consideration by the trial court, appellate review of the sentence is purely de novo. Id. If our review reflects that the trial court properly considered all relevant factors and the record adequately supports its findings of fact, this court must affirm the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In this instance, the trial court appropriately referred to the sentencing principles and painstakingly made the appropriate factual findings. Therefore, we defer to the trial court's factual findings and presume these findings to be correct. However, given the trial court's factual findings, we find that the trial court erred in applying the law to those findings and in imposing consecutive sentences in this instance.

Consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more of the criteria listed in Tennessee Code Annotated section 40-35-115(b) exist.[22] Consecutive sentences, however, should

---

[22] Those criteria are: (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood; (2) The defendant is an offender whose record of criminal activity is extensive; (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless

not be routinely imposed even for the offender whose record of criminal activity is extensive.  Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Comments; State v. Taylor, 739 S.W.2d 227, 230 (Tenn. Crim. App. 1987); State v. David L. Mayes, No. 03C01-9610-CR- 00365 (Tenn. Crim. App., Knoxville, Sept. 9, 1997);  State v. Roscoe C. Smith, No. 01C01-9502-CR-00031, slip op. at 10 (Tenn. Crim. App., Nashville, Oct. 12, 1995). Moreover, the consecutive sentencing factors "cannot be read in isolation from other provisions of the Sentencing Reform Act of 1989." Wilkerson,  905 S.W.2d at 937.

In State v. Wilkerson, our supreme court promulgated two additional requirements for consecutive sentencing: (1) the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and (2) are necessary to protect the public from further criminal conduct. 905 S.W.2d at 937-38.  We recognize that in Wilkerson,  the supreme court was considering the "dangerous offender" criterion, and that it is not cogently clear that Wilkerson applies to those cases involving one of the other six criteria.  See State v. David Keith Lane, No. 03C01-9607-CC-00259, slip op. at 11-13 (Tenn. Crim. App., Knoxville, June 18, 1997), perm. app. granted (Tenn. 1998).

The principles of sentencing, however, include the notion that any punishment imposed should be necessary in order to protect the public from a defendant with a lengthy history of criminal conduct. Tenn. Code Ann. § 40-35-102(1); State v. David L. Mayes, No. 03C01-9610-CR-00365, slip op. at 8 (Tenn.

---

indifference to            consequences; (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;  (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims; (6) The defendant is sentenced for an offense committed while on probation; or (7)The defendant is sentenced for criminal contempt.  Tenn. Code Ann. § 40-35-115(b) (1997).

Crim. App., Knoxville, Sept. 9, 1997)   As noted in Lane, one of the principles of the Act is to assure that defendants be punished "by the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1)(1997), and that "the sentence imposed should be no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2) (1997); State v. David Keith Lane, slip op. at 13.   Moreover, the ultimate purpose of consecutive sentencing is to protect the public. State v. Wilkerson, 905 S.W.2d at 935; Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976); State v. Roscoe C. Smith, No. 01C01-9502-CR-00031, slip op. at 10 (Tenn. Crim. App., Nashville, Oct. 12, 1995).

Since Wilkerson, the weight of precedent in this court favors the use of the two additional requirements in all consecutive sentencing cases.[23]   We

---

[23]       See e.g., Walter Powers v. State, 942 S.W.2d 551 (Tenn. Crim. App. 1996) (extensive record of criminal behavior); State v. Jernigan, 929 S.W.2d 391 (Tenn. Crim. App. 1996) (sexual abuse of a minor); State v. Kenneth W. Jackson, No. 02C01-9704-CR-00159 (Tenn. Crim. App., Jackson, May 5, 1998) (extensive record of criminal behavior); State v. Samuel Myron Carter, Jr., No. 01C01-9705-CR-00173 (Tenn. Crim. App., Nashville, Apr. 7, 1998) (record of extensive criminal behavior); State v. Larry Blair, (Tenn. Crim. App., Nashville, Apr. 7, 1998) (record of extensive criminal behavior); State v. Zachary L. Barnes, No. 01C01-9704-CC-00138 (Tenn. Crim. App., Nashville, Mar. 5, 1998) (extensive record of criminal behavior and offense committed while on probation); State v. Anthony Jason Merlo, No. 01C01-9611-CC-00471 (Tenn. Crim. App., Nashville, Feb. 23, 1998) (extensive record of criminal behavior and offense committed while on probation); State v. Noah Gene Noble, No. 02C01-9701-CC-00060 (Tenn. Crim. App., Jackson, Jan. 30, 1998) (extensive record of criminal behavior); State v. Percy Brown, No. 01C01-9701-CR-00015 (Tenn. Crim. App., Nashville, Nov. 5, 1997) (sexual abuse of a minor); State v. Carl E. Campen, No. 01C01-9512-CC-00433 (Tenn. Crim. App., Nashville, Oct. 24, 1997) (extensive record of criminal behavior); State v. David M. Cantrell, No. 01C01-9604-CC-00136 (Tenn. Crim. App., Nashville, Oct. 24, 1997) (extensive record of criminal behavior); State v. Phyliss Ann McBride, No. 01C01-9606-CC-00269 (Tenn. Crim. App., Nashville, Oct. 24., 1997) (extensive record of criminal behavior and offense committed while on probation); State v. Stanley Lawson, No. 01C01-9607-CR-00320 (Tenn. Crim. App., Nashville, Oct. 24, 1997) (sexual abuse of a minor); State v. Bobby Teaster, No. 03C01-9611-CC-00405 (Tenn. Crim. App., Knoxville, Sept. 26, 1997) (extensive record of criminal behavior); State v. Charles W. Sanderson, No. 01C01-9608-00384 (Tenn. Crim. App., Nashville, Sept. 9, 1997) (extensive record of criminal behavior); State v. David L. Mayes, No. 03C01-9610-CR-00365 (Tenn. Crim. App., Knoxville, Sept. 9, 1997) (extensive record of criminal behavior); State v. Charles Henry George, No. 01C01-9512-CC-00407     (Tenn. Crim. App., Nashville, Mar. 13, 1997) (extensive record of criminal behavior); State v. Gary W. Witherspoon, No. 01C01-9511-CC-00381 (Tenn. Crim. App., Nashville, Oct. 17, 1996) (extensive record of criminal behavior); State v. Roscoe C. Smith, No. 01C01-9502-CR-

recognize that our supreme court has granted permission to appeal in <u>Lane</u>, and ultimately this issue will be resolved by that court. However, in the meantime we are bound by this court's precedents. Therefore, consecutive life sentences may be imposed in this case only if the extended sentences reasonably relate to the severity of the offenses and an extended sentence in this case is required to protect the public against further criminal conduct by the defendant.

The trial court made extensive findings of fact. First the court concluded that four months of immersion in drug-related activity did not qualify the defendant as a professional criminal and that the defendant was not a dangerous offender.[24] <u>See</u> Tenn. Code Ann. § 40-35-115(b)(1),(4) (1997). Based on the defendant's daily use of illegal drugs for more than a year, the court found that the defendant had a extensive record of criminal behavior. <u>See</u> Tenn. Code Ann. § 40-35-115(b)(2) (1997). It found that the circumstances surrounding the commission of the crimes were aggravated and that the murders were especially brutal and cruel and that two consecutive life sentences were reasonably related to the severity of

00031 (Tenn. Crim. App., Nashville, Oct. 12 , 1995) (professional criminal and extensive record of criminal behavior); <u>State v. Jeffery Dion Webb</u>, No. 01C01-9409-CC-00327 (Tenn. Crim. App., Nashville, Oct. 4, 1995) (professional criminal). Other consecutive sentencing cases do not refer to the "additional" <u>Wilkerson</u> requirements, <u>e.g.</u>, <u>State v. David L. McClure</u>, No. 01C01-9505-CR-00145 (Tenn. Crim. App., Nashville, Apr. 30, 1997) (sexual abuse of a minor) or have held that <u>Wilkerson</u> held that consecutive sentencing as a dangerous offender requires the application of the two requirements. <u>State v. James Ray Bartlett</u>, No. 01C01-9509-CC-00302, slip op. at 16 (Tenn. Crim. App., Nashville, Apr. 7, 1998).

[24] The record isn't entirely clear as to the court's reasons for declining to find the defendant a dangerous offender. The court found that the defendant had shown little or no regard for human life and no hesitation about committing a crime when the risk to human life was high. However, these findings appear to pertain more to the kidnapping convictions than to the convictions for felony murder. Obviously these two factors would exist in any felony murder case.

On the other hand, had the trial court found the defendant a dangerous offender, we observe that the record may well have supported the finding. The two homicides occurred not as two parts of one incident, but as two discrete acts that were separated by a time for reflection and conference with the defendant's friends. Different means of killing helpless victims were employed.

However, finding the defendant a dangerous offender only brings the case squarely within the rule of <u>Wilkerson</u>, and consecutive sentencing would not be authorized where the court finds that the longer incarceration is not necessary to protect the public.

the offenses.  The record overwhelmingly supports these findings.

However, the trial judge found that the defendant, prior to becoming addicted to drugs, had been a "better than average" citizen.  He described the defendant as a "good family man" and "a hard, steady worker" until he was overtaken by drugs.  The trial judge found that the defendant's remorse for his crimes was genuine, and that the defendant was capable of rehabilitation.  The defendant has remained close to his parents and sister throughout, and their support for him has been unwavering.  At the sentencing hearing, close friends also testified to their affection for the defendant and expressed a belief in his ability to redeem his life.  An affidavit from the sheriff of Putnam Co. indicated that the defendant had been cooperative and had posed no problems during his nearly two years of incarceration in the county jail.  The defendant, who said he had been completely drug-free since his arrest despite the availability of drugs in jail, testified to his intent to continue his college education while he was serving his time.  The trial judge was able to observe the defendant and the other witnesses, and he clearly accredited the defendant's testimony.  Of critical significance to this court's review, the trial court found that the defendant was capable of rehabilitation and that, as long as the defendant was drug free, extended sentences were not required to protect the public.

The trial court, therefore, did not clearly determine whether extended sentences were required to protect the public from further criminal acts by this defendant.  The trial court's finding is conditional and hedges the outcome on the defendant's future, unforeseeable success in avoiding drugs.  This conditional finding averts the mandate of Wilkerson.

We note that previously this court, "under our power of de novo review," has itself made fact findings in support of the application of the Wilkerson requirements, see State v. Ricky Dean Cole, No. 03C01-9604-CC-00171, slip op.

at 6 (Tenn. Crim. App., Knoxville, July 29, 1997), but such a <u>de</u> <u>novo</u> finding was made <u>in</u> <u>the</u> <u>absence</u> of findings on the issue by the trial court. In the present case, the trial court made many material findings based upon extensive live testimony, including the testimony of the defendant. Although the proportionality of the length of the sentence to the severity of the offense is obviously appropriate for <u>de</u> <u>novo</u> appellate review, the second <u>Wilkerson</u> requirement, which involves the question of the defendant's amenability to rehabilitation, is more fact-driven. We are generally in no position to second-guess a trial judge who heard testimony from witnesses, which in this case included the defendant. In such a situation, we must defer to the trial court to clarify the conditional finding it made relative to the need for a lengthy sentences to protect the public.

Therefore, we vacate the trial court's imposition of consecutive sentencing and remand the case in order for the trial court to make appropriate findings under <u>Wilkerson</u> and to determine whether the defendant's two life sentences shall be served concurrently with or consecutively to each other.

**Conclusion**

Our review of the record and the law has disclosed no error requiring reversal of the defendant's convictions, and we affirm his convictions. The imposition of consecutive sentences, however, is vacated. We remand the case to the trial court for further proceedings pursuant to this opinion.

_____
CURWOOD WITT, Judge

CONCUR:

_____
PAUL G. SUMMERS, Judge

_____

40

JERRY L. SMITH, Judge